Gregory P. GOEHRING; David Mueller; John P. Gisla, Jr.; Nancy Harder; Glenn Nunes; John Mullen, Plaintiffs–Appellants,

v.

Roy T. BROPHY, Jr.; David Pierpont Gardner; Theodore L. Hullar; Robert E. Chason, Defendants–Appellees.

Nos. 94–16453, 95–15009.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 1996.

Decided Sept. 3, 1996.

---

Richard M. Stephens, Olympia, Washington, for plaintiffs-appellants.

Christopher M. Patti, Regents of University of California, Office of the General Counsel, University of California, Oakland, California, for defendants-appellees.

Before FERGUSON, D.W. NELSON, and FERNANDEZ, Circuit Judges.

FERGUSON, Circuit Judge:

The plaintiffs, students at the University of California at Davis ("the University"), appeal the district court's grant of summary judgment in favor of the University with respect to their free exercise of religion claim. The plaintiffs allege that the University's mandatory student registration fee violates their right to free exercise of religion because the fee is used, in part, to subsidize the University's health insurance program, which covers abortion services.

On appeal the students challenge: (1) the district court's grant of summary judgment to the University; (2) the district court's denial of the students' request for attorney's fees pursuant to 42 U.S.C. § 1988; (3) the district court's denial of the students' request for discovery and an evidentiary hearing on the issue of attorney's fees; and (4) the district court's denial of the students' request for attorney's fees pursuant to 28 U.S.C. § 1927.

## I. *Procedural Background*

On June 16, 1992, Gregory Goehring filed suit in district court against the Regents of the University of California and various officers of the University. On December 4, 1992, Goehring filed an amended complaint, adding five plaintiffs, and asserting six causes of action. The first three causes of action were "compelled speech" claims in which the plaintiffs alleged that their First Amendment rights to free speech were being violated by the University's policy of using mandatory student fees to finance the following activities: (1) the lobbying activities of the Associated Students of the University of California at Davis; (2) certain courses offered at the University's Experimental College; (3) the University's Women's Research and Resources Center; and (4) the Third World Forum, a student newspaper. The fourth cause of action alleged that the University's provision of student health insurance, which included coverage for abortion services, violated the Hyde Amendment, Pub.L. No. 103–333, § 509, 108 Stat. 2539, 2573 (1994).[1] The fifth cause of action alleged that the use of student fees to fund the Experimental College violated the Establishment Clause. The sixth cause of action alleged that the University's practice of subsidizing student health insurance with mandatory student registration fees violated the students' rights to free exercise of religion because the University's student health insurance covered abortion services.

The district court dismissed all but the sixth cause of action, the free exercise of religion challenge. Subsequently, the district court granted the University's motion for summary judgment on this claim. The students appeal only the district court's grant of summary judgment on the free exercise of religion claim[2] and its rulings on the attorney's fees issues.

1. The Hyde Amendment, which is enacted each year as an amendment to 42 U.S.C. § 1396a, provides:

    None of the funds appropriated under this Act shall be expended for any abortion except when it is made known to the Federal entity or official to which funds are appropriated under this Act that such procedure is necessary to save the life of the mother or that the pregnancy is the result of an act of rape or incest. Pub.L. No. 103–333, § 509, 108 Stat. 2539, 2573 (1994).

2. Because *Smith v. Regents of Univ. of Cal.*, 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500,

## II. Discussion

### A. Free Exercise of Religion Claim

We review a grant of summary judgment de novo. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court properly applied the relevant substantive law. *Id.*

The University has separate student health insurance programs for undergraduate students and for graduate and professional school students. Undergraduates are not required to have any health insurance, although they may choose to purchase it through the University's Undergraduate Student Health Insurance Program. The undergraduates who purchase insurance through the program receive a subsidy on their premiums in the amount of $18.50 per student, per quarter, which is taken from mandatory student registration fees.

Graduate and professional school students at the University are required to have health insurance. Under the Graduate Student Health Insurance Program, mandatory fees are collected from graduate and professional students to finance this program. This mandatory fee was established in 1989 after it was approved in a referendum by 87% of the graduate and professional students who voted. Graduate and professional students may opt out of the insurance program by demonstrating that they have qualifying health insurance from another provider. Those students who purchase insurance through the program receive a subsidy of $18.50 per insured student, per quarter, from registration fee receipts to reduce the cost of their premiums.

The University provides health services on campus to minimize the disruption of its students' academic pursuits due to illness or injury. The health insurance programs offered by the University cover a variety of services, including abortion services. However, abortions are not performed at the University's Student Health Center. Any student seeking an abortion is referred to an outside provider. The plaintiffs in the present case, undergraduate and graduate students, object to subsidizing the cost of abortions through their student registration fee subsidy. The plaintiffs allege that their sincerely held religious beliefs prevent them from financially contributing to abortions, and therefore, the student subsidy violates their right to free exercise of religion under the First Amendment.

The Religious Freedom Restoration Act of 1993 ("the Religious Freedom Act"), 42 U.S.C. § 2000bb (Supp. V 1993), provides the framework for analyzing the plaintiffs' free exercise of religion claim.[3] The Religious Freedom Act provides in pertinent part:

> (a) IN GENERAL.—Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
>
> (b) EXCEPTION.—Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.[4]

cert. denied, 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993), involved a compelled speech challenge, it is not relevant to this appeal.

**3.** The Religious Freedom Act was enacted by Congress in response to the holding in *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Court, in *Smith*, held that the government need not justify burdens imposed on the free exercise of religion by neutral laws of general applicability. *Id.* at 878–79, 110 S.Ct. at

1599–1600. The Religious Freedom Act restored the government's obligation to justify all substantial burdens on the free exercise of religion. 42 U.S.C. § 2000bb–1.

**4.** The Religious Freedom Act essentially requires the government to justify any regulation imposing a substantial burden on the free exercise of religion by showing that the regulation satisfies strict scrutiny.

■ To establish a violation of the Religious Freedom Act, the plaintiffs in the present case first must show that the University's subsidized health insurance program substantially burdens their right to free exercise of religion. If the plaintiffs are able to establish a substantial burden, the University must then demonstrate that its subsidized health insurance program is constitutionally permissible because it satisfies strict scrutiny. To do this, the University must show that: (1) its subsidized health insurance program furthers a compelling interest; and (2) its insurance program is the least restrictive means of furthering that compelling interest.

### 1. SUBSTANTIAL BURDEN

■ In construing the Religious Freedom Act, we look to our decisions prior to *Smith*, in which this court held that:

> To show a free exercise violation, the religious adherent, ... has the obligation to prove that a governmental regulatory mechanism burdens the adherent's practice of his or her religion by pressuring him or her to commit an act forbidden by the religion or by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; *the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.*

*Graham v. Commissioner*, 822 F.2d 844, 850–51 (9th Cir.1987) (emphasis added) (citations omitted), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989).

The plaintiffs in *Graham* were members of the Church of Scientology ("the Church"). The plaintiffs brought suit alleging that the Tax Court's refusal to grant them tax deductions for payments made to the Church violated their right to free exercise of religion. *Graham*, 822 F.2d at 846. This court affirmed the decision of the Tax Court, denying the plaintiffs' request for deductions. *Id.* at 850. We explained that the plaintiffs would have alleged a valid free exercise claim if they had demonstrated that the government was conditioning the receipt of a tax deduction on the abandonment of a central tenet of their religion. *Id.* at 851. However, the plaintiffs failed to establish such a burden. "[T]he fact that taxpayers will have less money to pay the Church, or that the Church will receive less money, does not rise to the level of a burden on appellants' ability to exercise their religious beliefs. Statutes are not invalid just because they affect a religious organization's operation." *Id.* (citing *EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272, 1279 (9th Cir.1982)).

The "substantial burden" requirement of a free exercise challenge was again addressed in *Bryant v. Gomez*, 46 F.3d 948 (9th Cir. 1995) (per curiam). The plaintiff in *Bryant*, an inmate, brought a free exercise claim against the prison in which he was confined. *Id.* at 948. The plaintiff alleged that his right to free exercise of religion was violated when the prison refused to provide him Pentecostal services. *Id.* This court rejected Bryant's free exercise challenge on the basis that Bryant had failed to allege any facts showing that the activities in which he wished to engage were mandated by his religion. *Id.* at 949. "[W]hile certain practices and instruments might be unique to the Pentecostal faith, Bryant has not argued or provided evidence to show that they are mandated by his faith." *Id.* This court concluded that Bryant did not establish a sufficient burden on his faith to allege a free exercise violation. *Id. See also United States v. Turnbull*, 888 F.2d 636, 639 (9th Cir.1989), *cert. denied*, 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990).

Accordingly, the plaintiffs in the present case must establish that the University's subsidized health insurance program imposes a substantial burden on a central tenet of their religion.[5] The plaintiffs have failed to meet this burden. The plaintiffs are not required

---

**5.** The University stipulated that the plaintiffs' sincerely held religious beliefs prohibit them from financially contributing to abortions. However, merely because the University has conceded that the plaintiffs beliefs are sincerely held, it does not logically follow, as the plaintiffs contend, that any governmental action at odds with these beliefs constitutes a substantial burden on their right to free exercise of religion.

to purchase the University's subsidized health insurance-undergraduate students are not required to have health insurance and graduate students may purchase insurance from any provider. Moreover, the student health insurance subsidy is not a substantial sum of money and the subsidy, taken from registration fees, is distributed only for those students who elect to purchase University insurance. Furthermore, the plaintiffs are not required to accept, participate in, or advocate in any manner for the provision of abortion services. Abortions are not provided on the University campus. Students who request abortion services are referred to outside providers. Finally, the plaintiffs' allegation that the University's health insurance system substantially burdens their right to free exercise of religion because it denies them a public education is incorrect. The plaintiffs are free to attend the University so long as they accept the minimal limitation placed on their free exercise rights by the University's registration fee.

In sum, the plaintiffs have failed to establish that the University's subsidized health insurance system imposes a substantial burden on the free exercise of their religion. However, even if the plaintiffs were able to satisfy the substantial burden requirement, the University's health insurance system nonetheless survives constitutional attack because it meets strict scrutiny—it is the least restrictive means of furthering a compelling government interest.

### 2. STRICT SCRUTINY ANALYSIS

#### a. Compelling Government Interest

■ A government regulation which imposes a substantial burden on an individual's right to free exercise of religion is constitutional only if it can be justified as the least restrictive means of furthering a compelling government interest. 42 U.S.C. § 2000bb–1.

There are a number of government interests which are furthered by the University's subsidized health insurance system:

(1) The University's health insurance system provides its students with affordable health insurance. A large number of students would be unable to obtain affordable health insurance from another source if it was not available through the University.

(2) The University's affordable health insurance helps to prevent the spread of communicable diseases which pose a serious problem on university campuses where students eat, sleep, and study in such close quarters.

(3) The University's affordable health insurance prevents students from being distracted from their studies by undiagnosed illnesses and medical bills which they cannot afford to pay. The insurance system is planned so that students will remain healthy and be able to receive the full benefits of a higher education.

Public health and well-being have been recognized as compelling governmental interests in a variety of contexts. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 300, 101 S.Ct. 2352, 2373, 69 L.Ed.2d 1 (1981) (holding that "[p]rotection of the health and safety of the public is a paramount governmental interest" which justifies summary administrative action in the prevention of mining disasters); *Rubin v. Coors Brewing Co.*, — U.S. —, —, 115 S.Ct. 1585, 1591, 131 L.Ed.2d 532 (1995) (stating that the government has a significant interest in protecting the health of its citizens by preventing brewers from competing on the basis of alcohol strength, which might lead to increased alcoholism); *Callahan v. Woods*, 736 F.2d 1269, 1274 (9th Cir. 1984) (stating that the AFDC program "promotes a government interest of the highest importance" in that it exists to care for needy dependent children). Similarly, we hold that the University's interest in the health and well-being of its students, advanced by its mandatory fee policy, is compelling.

#### b. Least Restrictive Alternative Analysis

■ The next step in strict scrutiny analysis, after having identified the compelling interests at stake, is to examine whether the means used to further those interests is the least restrictive way of doing so. 42 U.S.C. § 2000bb–1.

Although the plaintiffs in the present case brought suit under the Free Exercise Clause,

this is not a case in which the government has prohibited them from participating in a religious ritual, or penalized them for doing so. Rather, this case involves a challenge to the way in which the University, a governmental entity, spends its money. Accordingly, our least restrictive alternative analysis is guided by cases involving free exercise challenges to the government's use of tax dollars.

The Supreme Court addressed a free exercise challenge to the federal social security tax system in *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). The plaintiff in *Lee*, a member of the Old Amish Order, brought suit alleging that the imposition of social security taxes violated his free exercise rights, as well as those of his Amish employees. *Id.* at 254–55, 102 S.Ct. at 1053–54. The Court accepted as true the plaintiff's contention that both the payment and receipt of social security violated the religious beliefs of the Amish and that compulsory participation in the social security system interfered with the free exercise of their religion. *Id.* at 257, 102 S.Ct. at 1055. However, the Court concluded that the burden on the plaintiff's free exercise rights was justified because the social security system was essential to accomplish a compelling governmental interest. *Id.* at 260, 102 S.Ct. at 1056–57.

The Court explained that the social security system serves a compelling government interest because it provides a comprehensive insurance system, available to all participants, with costs shared by employers and employees. *Id.* at 258, 102 S.Ct. at 1055–56. The Court found that mandatory contributions from both covered employees and employers were indispensable to the fiscal vitality of the system. *Id.* If participation were voluntary, the Court reasoned, the system would be impossible to administer. *Id.* The Court acknowledged the difficulty of accommodating religious beliefs in the area of taxation because the United States is a cosmopolitan nation made up of almost every conceivable religion. *Id.* at 259, 102 S.Ct. at 1056. "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Reli-gious beliefs can be accommodated, ... but there is a point at which accommodation would 'radically restrict the operating latitude of the legislature.'" *Id.* (quoting *Braunfeld v. Brown*, 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961) (citations omitted)). Therefore, the Court concluded that the plaintiff was required to pay social security taxes on behalf of his employees. *Id.* at 261, 102 S.Ct. at 1057.

Similarly, the fiscal vitality of the University's fee system would be undermined if the plaintiffs in the present case were exempted from paying a portion of their student registration fee on free exercise grounds. Mandatory uniform participation by every student is essential to the insurance system's survival.

This court has rejected free exercise challenges to the spending of tax dollars as well. The plaintiffs in *Autenrieth v. Cullen*, 418 F.2d 586, 587 (9th Cir.1969), *cert. denied*, 397 U.S. 1036, 90 S.Ct. 1353, 25 L.Ed.2d 647 (1970), brought suit seeking refunds for a percentage of their federal income taxes paid for 1965 and 1966. The plaintiffs explained that a portion of their income taxes for these years was used to support the Vietnam War, to which they were religiously opposed. Therefore, the plaintiffs alleged that they were entitled to partial tax refunds on free exercise grounds. *Id.* at 587–88. This court accepted that the plaintiffs truly held these religious beliefs, yet rejected their free exercise claim. *Id.* at 588. We explained that:

> [N]othing in the Constitution prohibits the Congress from levying a tax upon all persons, regardless of religion, for support of the general government. The fact that some persons may object, on religious grounds, to some of the things that the government does is not a basis upon which they can claim a constitutional right not to pay a part of the tax.

*Id.*

This court further explained that if every citizen could refuse to pay all or part of his taxes on religious grounds, the government's ability to function would be severely impaired or destroyed because there are few, if any, governmental activities to which one person or another would not object. *Id.* at 588–89.

This logic applies to the facts of the present case as well. If the students at the University could refuse to pay a portion of their registration fee on religious grounds, the University's fee system would be seriously undermined. There are few, if any, University funded activities to which one student or another would not object.

The California Court of Appeal addressed the same issue as that raised in the present case in *Erzinger v. Regents of Univ. of Cal.,* 137 Cal.App.3d 389, 187 Cal.Rptr. 164, *cert. denied,* 462 U.S. 1133, 103 S.Ct. 3114, 77 L.Ed.2d 1368 (1983). The plaintiffs in *Erzinger* brought a free exercise challenge to the University's use of its compulsory student registration fee on the grounds that a portion of this fee was used to provide health care services to students, which included abortion services. *Id.* 187 Cal.Rptr. at 165. The court rejected the plaintiffs' free exercise challenge explaining that in order to prevail, the plaintiffs needed to show that the University's policy coerced their religious beliefs or unreasonably interfered with the practice of their religion. *Id.* at 166. The court explained that the plaintiffs failed to establish that the University's policy was coercive because they did not show that it: (1) coerced them from holding or expressing their views against abortion; (2) coerced them to advocate a position on abortion contrary to their beliefs; (3) forced them to use student health services, receive pregnancy counseling, have abortions, perform abortions, or endorse abortions; (4) denied them enrollment because of their religious beliefs; or (5) interfered with the practice of their religion. *Id.*

The court in *Erzinger* applied the logic of *Autenrieth* and explained that just as the Free Exercise Clause does not justify a refusal to pay taxes on religious grounds,

the First Amendment does not prohibit the University from requiring all students, regardless of religion, to pay fees for general student support services; the fact plaintiffs may object on religious grounds to some of the services the University provides is not a basis upon which plaintiffs can claim a constitutional right not to pay a part of the fees.

*Erzinger,* 187 Cal.Rptr. at 167. Although *Erzinger* is not binding upon us, its logic is sound and we apply it to the present case.

The plaintiffs' reliance on *Keller v. State Bar,* 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990) in an attempt to refute the applicability of the tax cases is unavailing because *Keller* is distinguishable. The plaintiffs in *Keller,* members of the State Bar, challenged the State Bar of California's use of compulsory bar dues to finance ideological and political activities. *Id.* at 4, 110 S.Ct. at 2231. The plaintiffs alleged that the State Bar's use of mandatory dues to fund such activities violated the Free Speech Clause of the First Amendment. The Court ruled in favor of the plaintiffs. *Id.* at 14, 110 S.Ct. at 2236. The Court explained that the specialized characteristics of the State Bar distinguish it from a typical government agency. *Id.* at 12, 110 S.Ct. at 2235. The Bar was created "not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession." *Id.* at 13, 110 S.Ct. at 2235. Therefore, because the State Bar is more like a labor union than a government agency, the Court held that the Bar may fund only activities which are germane to regulating the legal profession and improving the quality of legal services. *Id.* at 13–14, 110 S.Ct. at 2235–36; *See also Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 235–36, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977) (prohibiting agency-shop dues of dissenting non-union employees from being used to support political and ideological union causes that are unrelated to collective bargaining activities).

The plaintiffs in the present case allege that the University, like the State Bar, should not be considered a government agency for the purposes of First Amendment analysis. Therefore, the plaintiffs argue, *Keller* renders the University's use of its mandatory registration fee to subsidize student health insurance unconstitutional. However, the plaintiffs are mistaken. *Keller* is distinguishable from the present case on a number of grounds. First, *Keller* involved a free speech challenge whereas the present case involves a free exercise of religion chal-

lenge. Historically, the Free Speech and Free Exercise Clauses of the First Amendment have been analyzed under separate and distinct bodies of case law. Therefore, *Keller*'s relevance to the present case is minimal. Second, membership in the State Bar is compulsory to practice law in the State of California, whereas both the decision to attend college and the choice of universities in particular are voluntary decisions. Thus, the element of coercion which was present in *Keller* is lacking in the present case. Third, and most important, the characteristics and function of the University are much more akin to those of a typical government agency than are those of the State Bar. The University, like a state government, provides a wide spectrum of services to students, whereas the State Bar acts largely as an intermediary between its members and the state government, working to advance certain specialized interests. *Id.* at 13, 110 S.Ct. at 2235–36. Therefore, *Keller* is distinguishable from the present case and we rely on *Lee, Autenrieth,* and *Erzinger* to conclude that the University's use of its registration fee to subsidize health insurance is the least restrictive means of furthering a compelling government interest.

In sum, the plaintiffs' free exercise claim fails because: (1) the students have not established that the University's subsidized health insurance system imposes a substantial burden on their right to free exercise of religion; and (2) the University's subsidized health insurance system is the least restrictive means of furthering a compelling government interest.

### B. Request for Attorney's Fees Pursuant to 42 U.S.C. § 1988

#### 1. FACTUAL BACKGROUND

The plaintiffs filed suit against the University in district court on June 16, 1992, alleging not only a free exercise violation, but also challenging the constitutionality of the University's use of its mandatory student registration fee to fund various political and ideological activities of its student organizations.

The plaintiffs argued that the University's use of student fees to fund political and ideological activities violated their First Amendment rights to freedom of speech and freedom of association. The plaintiffs also brought an Establishment Clause challenge to the University's funding of its Experimental College with student fees on the ground that the Experimental College conducted classes on witchcraft and other religious rituals.

On November 4, 1993, the University revised its mandatory student fee policy. This revision included the withdrawal of funding from student fees for a number of student organizations and courses offered at the Experimental College. On July 11, 1994, the district court dismissed the plaintiffs freedom of speech, freedom of association, and Establishment Clause causes of action as moot as a result of the University's revision of its student fee policy.

On August 20, 1994, the plaintiffs filed a motion for attorney's fees pursuant to 42 U.S.C. § 1988.[6] The plaintiffs alleged that they were entitled to attorney's fees as a prevailing party because the University had revised its student fee policy in response to their lawsuit. The University argued that it had revised its student fee policy in response to *Smith v. Regents of Univ. of Cal.,* 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500, *cert. denied,* 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993), and not in response to the plaintiffs' suit. The district court found that the plaintiffs' lawsuit was not the driving force behind the University's revision of its student fee policy, and therefore, the court denied the plaintiffs' motion for attorney's fees. The plaintiffs now appeal the district court's denial of this motion.

On February 3, 1993, the California Supreme Court rendered its decision in *Smith v. Regents of the Univ. of Cal.,* 4 Cal.4th 843, 16 Cal.Rptr.2d 181, 844 P.2d 500. *Smith* held that the collection and use of mandatory student fees to support political and ideological student organizations violated the First

---

**6.** 42 U.S.C. § 1988 provides that in civil rights actions, the court, "in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

Amendment. *Id.*, 16 Cal.Rptr.2d at 196–97, 844 P.2d at 516. Shortly after the decision in *Smith* was handed down, the Regents filed a petition for certiorari with the U.S. Supreme Court. The University alleges that it was aware from the time that *Smith* was decided that if the petition for certiorari was denied, the University would be required to revise its student fee policy. Therefore, University administrators began the process of drafting, circulating, and revising the University's student fee policy to comply with *Smith* while the petition for certiorari was still pending. Several meetings were held during which policy drafts of a revised student fee policy were discussed, debated, and revised.

On October 4, 1993, the Supreme Court denied certiorari in *Smith*, 510 U.S. 863, 114 S.Ct. 181, 126 L.Ed.2d 140 (1993). The University promptly revised its student fee policy and announced its revisions on November 4, 1993. This revised student fee policy ("the *Smith* policy") prohibited the use of student fees to support political, ideological, or religious organizations and activities. It also provided a mechanism for students to request and receive a refund of the portion of their fees that had gone to support such organizations in the past.

## 2. ANALYSIS

■ A district court's award of attorney's fees pursuant to 42 U.S.C. § 1988 is reviewed for an abuse of discretion. *Kilgour v. City of Pasadena*, 53 F.3d 1007, 1010 (9th Cir.1995). A district court's factual determination underlying a prevailing party determination will not be set aside absent clear error. *Sablan v. Department of Fin.*, 856 F.2d 1317, 1324 (9th Cir.1988).

■ A party is a prevailing party within the meaning of section 1988 if the party has prevailed on the merits of at least some of its claims. *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989–90, 64 L.Ed.2d 670 (1980). An inquiry is made into whether the plaintiff has " 'succeed[ed] on any significant issue in litigation which achieve[d] some of the benefit ... sought in bringing suit.' " *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quot-ing *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)).

■ This court also recognizes a catalyst test as an alternative theory for granting attorney's fees under 42 U.S.C. § 1988 when no judicial relief has been granted. *Kilgour*, 53 F.3d at 1010. Under the catalyst test, a plaintiff is a prevailing party for the purposes of section 1988 if its lawsuit prompted the defendants to take action to satisfy its demands. *Sablan*, 856 F.2d at 1325. In order for a plaintiff to show that the lawsuit was the catalyst which prompted action by the defendants, the plaintiff must show that: (1) there is a "causal link" between the lawsuit and the relief actually obtained; and (2) there is a legal basis for the claim. *Id.*

■ With respect to the first prong of the test, the plaintiffs in the present case point to two factors which they argue indicate that their lawsuit caused the University to revise its student fee policy. First, the plaintiffs allege that they received relief beyond that necessitated by the decision in *Smith*. The plaintiffs allege that the following actions by the University were not mandated by *Smith*: (1) The defendants altered their student fee policy to prohibit not only the funding of "political and ideological" organizations and activities, but also to prohibit the funding of "religious" organizations and activities, including instructional activities at the Experimental College; and (2) The defendants fashioned a unique remedy for plaintiff Goehring.

However, it is clear that the plaintiffs did not receive any relief which was not mandated by *Smith*. The changes made by the University to its student fee policy were made to comply with both the letter and the spirit of the *Smith* decision. Moreover, the plaintiffs submitted a Stipulated Statement of Facts to the district court stating that the University enacted its revised student fee policy "to bring its policies in compliance with the *Smith* decision." The plaintiffs' allegation that Goehring was personally granted relief beyond that mandated by *Smith* is false as well. The relief granted to Goehring was the same type of relief as that fashioned for the plaintiffs in *Smith*, and was granted

to Goehring in accordance with the University's *Smith* policy.

The second basis on which the plaintiffs rely in alleging a causal link between their lawsuit and the University's revision of its fee policy is a sequence of events argument. The plaintiffs assert that the University did not revise its student fee policy until *after* the plaintiffs had defeated two of the University's motions to dismiss.[7] Therefore, the plaintiffs argue, their lawsuit was the impetus behind the University's change in its fee policy. The district court, in contrast, found that the University changed its policy in response to the denial of certiorari in *Smith*. The mere fact that the University revised its fee policy after the court rejected two motions to dismiss is insufficient to demonstrate that the district court abused its discretion in denying attorney's fees pursuant to § 1988. Although "chronological events are important, ... [they are] not a definitive factor[ ] in determining whether or not a defendant can be reasonably inferred to have guided his actions in response to a plaintiff's lawsuit." *Braafladt v. Board of Governors*, 778 F.2d 1442, 1444 (9th Cir.1985). *See also Beach v. Smith*, 743 F.2d 1303, 1306–07 (9th Cir.1984) (holding that the district court did not clearly err in finding that the plaintiff failed to prove a causal connection where the plaintiff provided no direct evidence of causation, and relied solely on the sequence of events); *American Constitutional Party v. Munro*, 650 F.2d 184, 187–88 (9th Cir.1981) (holding that "chronology of events" evidence supplemented by a legislator's affidavit stating that the plaintiff's lawsuit had been discussed prior to passage of an amendment was insufficient evidence of a causal link).

## C. Request for Discovery and an Evidentiary Hearing

The plaintiffs, in their reply brief to the district court, made a last-minute request for additional discovery and an evidentiary hearing on the issue of attorney's fees. The plaintiffs now appeal the district court's denial of this informal request.

A district court's decision whether to permit additional discovery on the issue of attorney's fees is reviewed for an abuse of discretion. *Sablan v. Department of Fin.*, 856 F.2d 1317, 1321 (9th Cir.1988). "Broad discretion is vested in the trial court to permit or deny discovery, and its decision to deny discovery will not be disturbed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant." *Id.* (citation and quotation omitted).

The district court clearly acted within its discretion in denying the plaintiffs' informal request for discovery and an evidentiary hearing because the plaintiffs failed to show that the denial of discovery would result in actual and substantial prejudice. Moreover, the plaintiffs failed to explain what they hoped to accomplish from an evidentiary hearing. *See Williams v. Alioto*, 625 F.2d 845, 849 (9th Cir.1980) (holding that the district court did not abuse its discretion in denying the plaintiff's late request for an evidentiary hearing on the issue of attorney's fees), *cert. denied*, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981).

## D. Request for Attorney's Fees Pursuant to 28 U.S.C § 1927

The plaintiffs also made a last-minute request for attorney's fees pursuant to 28 U.S.C. § 1927 in their reply brief to the district court. The plaintiffs now appeal the district court's denial of this request.

A district court's factual findings underlying its decision to impose sanctions pursuant to 28 U.S.C. § 1927 are reviewed for clear error. *Bader v. Itel Corp. (In re Itel Securities Litigation)*, 791 F.2d 672, 674 (9th Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). The legal conclusions of the district court are reviewed de novo. *Id.* The appropriateness of the sanction is reviewed for an abuse of discretion. *Id.*

Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may

---

**7.** The University filed two motions to dismiss which were denied on March 5, 1993 and August 13, 1993, with respect to the students' freedom of speech and freedom of association claims.

be required by the court to personally satisfy the ... attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. The plaintiffs in the present case allege that the defendants unreasonably and vexatiously multiplied the proceedings by continuing to defend against this action when the defendants were aware that they might be required to revise their student fee policy in response to the *Smith* decision. The plaintiffs argue that the defendants should have asked for a stay in proceedings until the outcome of *Smith* was determined.

"The imposition of sanctions under section 1927 requires a finding that the attorney acted recklessly or in bad faith." *Kanarek v. Hatch,* 827 F.2d 1389, 1391 (9th Cir.1987). There is no evidence in the record to show that the defendants in the present case acted in this manner.

Therefore, the district court did not abuse its discretion in denying the plaintiffs' motion for attorney's fees pursuant to 28 U.S.C. § 1927.

III. *Conclusion*

The decision of the district court is AFFIRMED. The plaintiffs request for attorney's fees on appeal is denied.

FERNANDEZ, Circuit Judge, concurring:

I concur in Judge Ferguson's opinion, but write separately to express some concerns about the reasoning he has been required to employ.

In my opinion, the Supreme Court began to light the way to a proper construction of the First Amendment's clauses on religion when it decided *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). I do not agree with this court's crabbed view of that case, which suggests that it is limited to criminal matters. *See American Friends Serv. Comm. Corp. v. Thornburgh,* 961 F.2d 1405, 1407 (9th Cir.1991); *NLRB v. Hanna Boys Ctr.,* 940 F.2d 1295, 1305 (9th Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). That simply overlooks the general principles established in *Smith,* which point to the dangers of attempting to analyze the validity of neutral laws from the vantage point of some individual's religious beliefs. *See* 494 U.S. at 882–89, 110 S.Ct. at 1602–06. In other words, in *Smith* the Supreme Court reminded us that laws of general application do not run afoul of the religion clauses; rather, those clauses assume and require an evenhanded neutrality both toward and on behalf of religious belief. Were there any doubt about the accuracy of this observation it was laid to rest when the Court decided *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). There the Court said, again and again, that what the religion clauses demand is "neutrality." *See, e.g., id.* at 531, 533–34, 541, 113 S.Ct. at 2226, 2227, 2231. The Court also insisted upon general applicability, but as Justice Scalia pointed out, that and neutrality greatly overlap. *Id.* at 557–58, 113 S.Ct. at 2239 (Scalia, J., concurring). Neutrality points to a requirement that the laws be evenhanded "by their terms"; general applicability to a requirement that they be so in "design, construction [and] enforcement." *Id.* at 557, 113 S.Ct. at 2239. I use the single word "neutrality" to refer to both facets. That approach would easily resolve this case in favor of the University. *Cf. Smith v. Fair Employment & Housing Comm'n,* 12 Cal.4th 1143, 1161–65, 913 P.2d 909, 919–21, 51 Cal. Rptr.2d, 700, 709–12 (1996) (FEHC) (neutrality approach easily decides First Amendment issue).

Moreover, I have serious doubts about the constitutionality of Congress's attempt to overrule *Smith* and to reinstate (or instate) a flawed view of the scope and proper construction of the religion clauses. In this I am not alone. *See, e.g., FEHC,* 12 Cal.4th at 1179–92, 913 P.2d at 931–39, 51 Cal.Rptr.2d at 722–30 (Mosk, J., concurring); Christopher L. Eisgruber and Lawrence G. Sager, *Why the Religious Freedom Restoration Act Is Unconstitutional,* 69 N.Y.U. L.Rev. 437, 444–45, 452–60 (1994); Scott C. Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power,* 73 Tex. L.Rev. 247, 285–302 (1994). Nevertheless, we have already at least tacitly decided that the provisions of the RFRA should be fol-

lowed.[1] *See Cheema v. Thompson,* 67 F.3d 883, 885–86 (9th Cir.1995); *Droz v. Commissioner,* 48 F.3d 1120, 1122–24 & n. 2 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 656 (1996); *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1392–95 & n. 1 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 510, 130 L.Ed.2d 417 (1994). The parties do not argue to the contrary.

Justice Mosk has outlined some of the problems which are subtended when courts undertake decisions about whether certain views are "central" to a person's religion or religious beliefs. *See FEHC,* 12 Cal.4th at 1189–90, 913 P.2d at 938, 51 Cal.Rptr.2d at 728–29 (Mosk, J. concurring). Moreover, once we wander off the lighted neutrality path we are in the midst of a dense bog, and our reason for doing so hardly matters. Nor does it matter that we wandered to one side or the other. In either case, we are in danger of being sucked into a mire of confusion or overcome by a miasma of dubiety. In this area we find ourselves parading out complex tests and reasons, none of which are particularly logical or convincing.

We have to explain why members of one religion can carry knives to school when no one else can. *Cheema,* 67 F.3d at 885–86. We find ourselves struggling to explain why people who have a particular belief must still pay their taxes, even though those taxes will be used to foster programs that are antithetical to their beliefs. *See Droz,* 48 F.3d at 1122–24; *see also United States v. Lee,* 455 U.S. 252, 259–61, 102 S.Ct. 1051, 1056–57, 71 L.Ed.2d 127 (1982). We find ourselves spilling a good deal of ink trying to explain just why, or how, a police department can examine the activities of a high-ranking officer to see if he is properly performing his job. *See Vernon,* 27 F.3d at 1392–95. Finally, we find ourselves trotting out the same complex formulae to try to explain to Goehring why he must pay his student fees, even if they will

be used to fund projects that are anathema to him. In each case, however, the answer should be that the governmental action in question is perfectly neutral and evenhanded. Any restriction or mulct is evenly applied to all and only falls upon the particular believer in the way that it falls on everyone else. That is why taxes and fees must be paid. That is why performance can be examined.[2] If we cannot say that a law or practice is evenhanded, the law or practice itself should fall, and that is an end to it.

In fine, in my opinion the proper approach to all of these issues is to treat religion, non-religion, religious belief, and other beliefs absolutely equally. The proper coign of vantage for the government is a promontory of neutrality. That would yield a simple and correct answer to this case—Goehring must pay his fees just as everyone else must. He may not like a particular use of those fees by the University, but then others might not like other uses. That is not the point. The point is that the fees must be paid by all who attend the University, without respect to sect or belief. However, our precedent forces us into the more complicated approach we have taken in this case, an approach which fortunately arrives at the same right answer.

Thus, I concur.

---

**1.** Flawed construction of the religion clauses may not be the only reason to question the RFRA. *See, e.g., Flores v. City of Boerne,* 877 F.Supp. 355, 357 (W.D.Tex.1995), *rev'd,* 73 F.3d 1352, 1363 (5th Cir.1996); Jay S. Bybee, *Taking Liberties with the First Amendment: Congress, Section 5, and the Religious Freedom Restoration Act,* 48 Vand.L.Rev. 1539, 1624–33 (1995); Daniel O. Conkle, *The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute,* 56 Mont.L.Rev. 39, 60–79 (1995). However, for purposes of this opinion those theories are not important.

**2.** Of course, this approach would also require that knife carrying by children in school will not be permitted, religious beliefs notwithstanding.