CLIFTON, Circuit Judge,
concurring in part and concurring in the judgment: ■
One of the primary teachings of the Hippocratic School is embodied in the maxim “first do no harm.” The phrase serves as a guiding principle for physicians who are debating the use of an intervention that carries an obvious risk of harm but a less certain chance of benefit. In this case, Dr. Thomas Bell refused to prescribe a course of interferon and' ribavirin therapy to treat Geprge Mitchell’s Hepatitis C because he determined that the treatment was more likely to harm Mitchell than cure him. The primary basis for Dr. Bell’s treatment decision was that the progression of Mitchell’s Hepatitis C had not advanced to the point where the toxicities of the treatment were justified. But Dr. Bell also considered that, because of Mitchell’s race, he was far less likely to be cured.
This court has never addressed whether the Constitution forbids a doctor from considering credible scientific evidence that individuals of a certain race respond poorly to a particular treatment. Nor have we addressed what standard of scrutiny would be. used to evaluate- such a claim. We- do not need to address those questions in order to resolve this case, and I would not do so.
I agree with the conclusions of the majority opinion that the Eleventh Amend *448 ment does' not bar Mitchell’s claim for damages against the Defendants in their individual capacities, that his claims for injunctive and declaratory relief are moot, and that the summary judgment dismissing his claims for damages against Kelly Cunningham was appropriate and should be affirmed. I join the portions of the majority opinion that state and explain those conclusions. I also agree that Dr. Bell is entitled to qualified immunity on the claim for damages against him and join the portion of the majority opinion that affirms the summary judgment in his favor. That is enough to conclude the case.
The majority opinion goes on to discuss the question of whether Dr. Bell violated Mitchell’s constitutional rights and concludes that on that question summary judgment was not appropriate. It is that portion of the case that raises the difficult issues identified above. The Supreme Court has made clear that we are not required to consider the question of whether there has been a violation of plaintiffs constitutional rights if the case can be resolved, as this one has been, on the ground that the constitutional right at issue was not clearly established at the time. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808 (2009).
Taking up that question, as the majority opinion does, I ultimately agree with the majority’s determination that strict scrutiny should be applied in these circumstances, though not without some hesitation. I would, however, hold that Dr. Bell’s limited consideration of Mitchell’s race was narrowly tailored to further the State’s compelling interest in preserving the health of the patient committed to its custody, and thus, I would conclude that Mitchell’s constitutional rights were not violated.- I acknowledge that the- argument presented by the Defendants’ counsel devoted little attention to that issue. The majority opinion supports its conclusion with the observation, at 446, that Dr. Bell failed to offer any compelling or narrowly tailored justification for the racial classification at issue here, and that is an accurate assessment. The justification for the treatment is apparent, however, and our failure to recognize it may do mischief when a similar case arises in the future. The strict scrutiny. standard intentionally sets a very high bar, and the majority opinion may leave the impression that medical judgment does not provide sufficient justification.
Because insufficient attention has been given to this issue by the parties, I would prefer that we resolve this case without getting into the issue of whether Mitchell’s constitutional' right was violated. We should follow the example of the physicians’ maxim — do no harm — by leaving that question for another day. As the majority has elected to address that question, though, I must note my disagreement with its conclusion that Dr. Bell’s treatment was not sufficiently justified.
L Background

A. Hepatitis C Treatment Standards

Hepatitis C is a viral liver disease with effects that range in severity from short-term illness to cirrhosis and liver cancer. “Until recently, hepatitis C treatment was based on therapy with interferon and riba-virin, which required weekly injections for 48 weeks.” See World Health Organization, Hepatitis C (2015).[1] However, the treatment “caused frequent and sometimes life-threatening adverse reactions” that deterred many patients from completing therapy. Id.
*449 Despite these rigors, it “is well known that many patients will not be cured by the treatment, and that patients of European ancestry have a significantly higher probability of being cured, than patients of African ancestry.” Dongliang Ge, et al., Genetic Variation in IL28B Predicts Hepatitis C Treatment-Induced Viral Clearance, 461 Nature 399 (2009). Part[1] of the reason for the divergence is that African Americans are.much less likely to inherit a polymorphism near the IL28B gene that helps the liver eliminate the Hepatitis C virus. See id. As a result, physicians must consider this ethnic disparity to accurately assess the potential efficacy of the treatment in African American patients.
The standard of care for determining whether to prescribe interferon and ribavi-rin is individualized and multi-factoral. It requires balancing “(1) the severity of liver disease, (2) the potential of serious side effects, (3) the likelihood of treatment response, and (4) the presence of comorbid conditions.” See Doris B. Strader, et al., Diagnosis, Management, and Treatment of Hepatitis C, 39. Hepatology 1147, 1155 (2004) .(numbering added). With. respect to theseverity of the disease, “treatment is indicated in those with more-than-portal fibrosis,” which means that liver damage has progressed to a moderate grade.. Id. The likelihood of a treatment response Is indicated by the genotype of Hepatitis C that the patient has been infected with and the patient’s viral load.. Id. at 1153 (stating that individuals with Hepatitis C genotype 1 and individuals with-high, viral loads are substantially less likely to achieve a sustained virologic response), In addition, weight influences outcomes because heavier individuals require higher dosages of medicine, and thus, are more likely to experience prohibitive side effects. Finally, race is a significant predictor-of success, and it complicates treatment decisions for African Americans because the high toxicities of the treatment must-' be weighed against a more fractional chance of a sustained virologic response.

B„ Mitchell’s Treatment History

Mitchell is a sexually violent predator who resides at a special commitment center in''Washington. He was first diagnosed with Hepatitis C two years prior to his civil commitment. ' In 2005, Mitchell consulted Dr. Michael Priebe regarding Hepatitis C treatment options, including interferon and ribavirin therapy. Mitchell understood that the treatment was weight based, and agreed to postpone treatment until he could lose weight.
In 2009, Mitchell met with Dr. Bell and requested a referral for interferon and ribavirin therapy because he believed that he had lost the weight necessary to begin treatment. Mitchell also explained that he had recently remarried and that he did not want to infect his wife. Dr. Bejl informed Mitchell that he ojily had a fractional chance of achieving a remission-like state from the treatment because of his genotype of Hepatitis C and because of his African ancestry.. Dr, .Bell further explained that even if the treatment were successful, Mitchell,-would still have Hepatitis ,C and could still infect his wife. Dr. Bell then reviewed Mitchell’s most recent liver biopsy, which showed minimal fibrotic advancement. He concluded that Mitchell’s “Hepatitis C had not progressed to a level that would justify the physically demanding side effects” of the treatment, and refused to refer Mitchell for treatment.
Sometime thereafter, in 2012, Mitchell was placed on interferon and ribavirin therapy." As the majority opinion notes, at 441, that treatment was unsuccessful. Mitchell responded poorly and did not achieve a Sustained virologic response.
*450 II. Discussion .
• A. The Strict Scrutiny Standard
The Supreme Court has held that “all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny.” Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 236, 115 S.Ct. 2097 (1995) (internal quotation marks and citation omitted). That is “[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic.” Id.
We have never previously applied strict scrutiny to the medical treatment decisions of prison doctors. Though racial classifications based on race “seldom” provide a relevant basis for disparate treatment, “seldom” does not mean “never.” It seems to me • indisputable, based on the scientific evidence referenced above, that medicine is a place where the “seldom” sometimes occurs. ’ Oür history is scarred with reprehensible race-based actions, including the medical and scientific decisions referred to in the majority opinion, at 444-45, and I condemn those actions, but I do not see how the medical decision in this case can fairly be analogized to those. Treatment was not withheld from those victims based on a professional judgment, based on medical science, that'the treatment would do more harm than good.
Nonetheless, the Supreme Court has “insistéd on strict scrutiny in every context, even for so-called ‘benign’ racial classifications.” See Johnson v. California, 543 U.S. 499, 505, 125 S.Ct. 1141 (2005). Someday the Court may encounter a case where medical science presents the “seldom” situation and have the opportunity to consider whether strict scrutiny should apply in that circumstance.,. Unless and until it does, I, agree with the majority opinion that the strict scrutiny standard applies here.
A decision to apply the strict scrutiny standard is sometimes viewed as the end of the case because the bar is set too high to surmount, but that is not how the doctrine is supposed to be applied. “Strict scrutiny is not strict in theory, but fatal in fact.” Grutter v. Bollinger, 539 U.S. 306, 326, 123 S.Ct. 2325 (2003) (internal quotation marks and citation omitted). Indeed, its application “says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny.” Adarand, 515 U.S. at 230, 115 S.Ct. 2097.
The strict scrutiny standard is better understood as “a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context.” Grutter, 539 U.S. at 327, 123 S.Ct. 2325. “Context matters when reviewing race-based governmental action under the Equal Protection Clause.” Id. The “fundamental purpose” of strict scrutiny is to “take ‘relevant differences’ into account.” Adarand, 515 U.S. at 228, 115 S.Ct. 2097. “Prisons are dangerous places, and the special circumstances they present may justify racial classifications in some contexts.” Johnson, 543 U.S. at 515, 125 S.Ct. 1141. The danger of prisons might not be a relevant factor here, but the institutional setting might be. In the nuanced context of correctional medicine, the court must perform a searching and careful analysis that takes the relevant differences into account.

B. Defendants’ Compelling Interest

“[I]n some situations a State’s interest in facilitating the. health, care of its citizens is sufficiently compelling to support the use of a suspect classification.” Regents of *451 the University of California v. Bakke, 438 U.S. 265, 310, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); see also Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (stating that a State may have compelling interests “in safeguarding health, [and] in maintaining medical standards”). Indeed,. individual health and well-being have been recognized as a compelling governmental interest in a variety of contexts, including prisons. See, e.g., Warsoldier v. Woodford, 418 F.3d 989, 996-98 (9th Cir.2005) (stating that prison officials have a compelling interest in preserving inmate health); Goehring v. Brophy, 94 F.3d 1294, 1300 (9th Cir.1996) (holding that a “University’s interest in the health and well-being of its students ... is compelling”).
This case implicates the State’s compelling interest in safeguarding the health of a civilly committed individual. As Dr. Bell explained, he did not recommend Mitchell for interferon and ribavirin treatment because Mitchell’s liver damage had not progressed to a level that would justify the physically demanding side effects of the treatment. Dr. Bell also noted that Mitchell had a fractional chance of achieving a remission-like state. To the extent that Dr. Bell considered Mitchell’s race, it was only to inform his assessment of the likelihood of successful treatment. That narrow consideration was necessary to a fully informed treatment decision, and therefore, was necessary to further the State’s compelling interest in preserving Mitchell’s health.
This case also implicates the State’s compelling interest in maintaining appropriate medical standards because, as noted above, a fully informed assessment of the potential efficacy of interferon and ribavi-rin treatment requires the consideration of race. Maintaining medical standards is a compelling interest- for physicians because they may be subject to professional and legal sanctions if they make substandard treatment decisions. It is equally compelling for the State, which has an obligation to retain quality physicians who are capable of providing adequate medical care. If state-employed doctors are required to deliver substandard care or to prescribe treatments that they believe are inappropriate, those doctors may either refuse to work for the State or be exposed to professional and legal liabilities. As a result, the State’s interest in maintaining, medical standards has a direct effect on its compelling interest in preserving inmate health.
The majority opinion holds, at 446, that Drv Bell violated Mitchell’s constitutional rights because he failed to offer any compelling justification for his statement that interferon and ribavirin treatment is less effective in African Americans. But this opinion is the first instance in which our eourt has applied strict .scrutiny to the treating decision of a correctional physician. Given the novelty of this case, I believe that Dr. Bell successfully articulated a compelling State interest in the health of his patient when he explained that he refused to prescribe treatment because he thought it would do mpre harm than good. Mitchell presented no evidence that Dr. Bell acted based on any racial animus or with an intent to discriminate against Mitchell based on race. Dr. Bell’s attorney might not have uttered, the magic words “compelling state interest,” but we know enough to conclude that Dr. Bell did not violate Mitchell’s constitutional rights.
The majority opinion does not disagree with either Dr. Bell’s explanation or my observation that there was no evidence of racial animus. It simply states, at 446 n. 6, that Dr. Bell’s explanation is not enough 'to satisfy the strict scrutiny standard. Why not? The majority opinion does not say. Applying that standard in a way that requires a doctor to do more harm than *452 good violates more than “a Hippocratic oath-like aspirational goal.” Id. It violates good sense.

C. Dr: Bell’s Consideration of Race was Narrowly Tailored

“When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the ‘narrow tailoring’ test.” Adarand, 515 U.S. at 237, 115 S.Ct. 2097. “The purpose of the narrow tailoring requirement 'is to ensure that the means chosen ‘fit’ th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was- illegitimate racial prejudice or stereotype.” Grutter, 539 U.S. at 333, 123 S.Ct. 2325 (internal quotation' marks ■ and citation omitted). The court must e'arefully analyze “the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context.” Id. at 327, 123 S.Ct. 2325. In this case, Dr. Bell’s consideration of race was narrowly tailored. In the words of Grutter, “there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.” Id. at 333, 123 S.Ct. 2325.
As an initial matter, Dr. Bell’s decision to deny Mitchell’s treatment request was not made based on a general policy of excluding African Americans from interferon and ribavirin therapy. Rather, Dr. Bell performed an individualized and mul-ti-factoraT assessment of Mitchell’s objective profile. See Grutter, 539 U.S. at 334, 123 S.Ct. 2325 (holding that a race-sensitive admissions program was narrowly tailored because the consideration of race was merely one factor in the decision-making process and individualized consideration was given to each applicant). Dr.’ Bell considered that Mitchell had a strain of Hepatitis C that was less likely to respond to interferon and ribavirin by nearly a 2:1 ratio. Dr. Bell also gave great weight to Mitchell’s- most recent liver biopsy, which showed minimal fibrotic advancement. Dr. Bell did explain to Mitchell that his African ancestry reduced his chance of achieving a sustained virologic response, but he did not refuse to prescribe treatment on that basis. Rather, Dr. Bell indicated that if Mitchell’s liver condition had been worse, he would have recommended Mitchell for treatment. Mitchell acknowledged that other African American inmates with his genotype of Hepatitis C were receiving interferon and ribavirin therapy, which suggests that treatment decisions were typically made on an individualized basis. In sum, nothing in the record suggests that Dr. Bell’s decision was based on invidious discrimination or illegitimate motive. 'And, with the benefit of hindsight, we now know that Dr. Bell’s professional judgment was correct — when Mitchell received the treatment he sought, it was unsuccessful.
The narrowness of Dr. Bell’s decision is further demonstrated by how closely it adheres to the standard of care used to evaluate a patient for potential interferon and ribavirin therapy. As noted above, at 449, physicians are supposed to balance the severity of liver disease, the potential of serious side effects, the likelihood of treatment response, and the presence of comorbid conditions. That is exactly what Dr. Bell did. Dr. Bell’s consideration of race was based on credible, peer-reviewed studies, and it helped him make a fully informed assessment of “the likelihood of a treatment response.” Strader, supra, at 1155. Indeed, had Dr. Bell failed to consider Mitchell’s race, his medical assessment would have been under-informed and would have fallen below an acceptable standard of care.
*453 The relevant standard of care is a unique characteristic of the medical context that must be taken into account for purposes of narrow tailoring. See Grutter, 589 U.S. at 327, 123 S.Ct. 2325 (“Context matters when, reviewing race-based governmental action.”). Physicians are constrained by professional and legal regimes that require them to meet or exceed the relevant standard of care, and they may suffer significant sanctions if they do not. See Pickup v. Brown, 740 F.3d 1208, 1228 (9th Cir.2013) (“[D]octors are routinely held liable for giving .negligent medical advice to their patients, without serious suggestion that the First Améndment protects their right to give advice that' is not consistent with the accepted standard of care.”). The Equal Protection Clause should not be interpreted in a manner that compels or motivates a physician to prescribe a course of treatment that he or she believes is not medically warranted. In this instance, Dr. Bell’s compliance with a scientifically justified standard of care was a narrowly tailored means of making an informed treatment decision regarding-an individual whose health had become' the state’s responsibility.
The institutional context presents additional challenges that must also be taken into account. Most significantly, the prevalence of Hepatitis C infection in prison is far higher than it is in the general population, and approximately 30% of individuals with Hepatitis C pass through the correctional system in a given year. See Kara Chew, et al., Treatment Outcomes with Pegylated Interferon and Ribavirin for Male Prisoners with Chronic Hepatitis C, 43 J. Clinical Gastroenterology. 686 (2009). The high rate of Hepatitis C coupled with the astronomical cost of therapy has forced state institutions to prioritize treating those individuals whose condition has advanced to the point of medical necessity. See Lara Strick, Treatment of Hepatitis C in '-a Correctional Setting, Hepatitis C Online (Dec. 11, 2015). As a result, physicians in those institutions must respond to the challenge of dealing with inmates who want to be treated-but fail to meet the guidelines. Adhering to guidelines that prioritize treatment for individuals with significant disease progression is a narrowly tailored way to meet that challenge. Cf. Peralta v. Dillard, 744 F.3d 1076, 1083 (9th Cir.2014) (en band)' (stating that it is appropriate to consider the resources available-to a prison official who lacks authority over budgeting decisions when determining whether the official is liable for money damages for deliberate indifference to the serious medical needs of a prisoner).
The majority opinion disputes-none of this, yet nonetheless ■ concludes that - Dr. Bell violated Mitchell’s constitutional rights. Grutter instructs us to, “carefully examin[e] the importance and the sincerity of the reasons” for considering race in making a decision. Grutter, 539 U.S. at 327, 123 S.Ct. 2325. The majority opinion does not. ■ Its conclusion — that Dr. Bell’s exercise-of professional judgment based on scientific evidence, without racial animus, nonetheless constituted racial discrimination in violation of the Constitution — is both- inconsistent with precedent and detached from reality.

D, Implications ’of the Majority Opinion

I fear that the majority opinion creates significant' uncertainty regarding the extent to which doctors can consider ethnic and racial differences in making judgments as to medical treatment. Is a doctor who is' treating an institutionalized African American patient with Hepatitis C genotype 1 required to pretend that the likelihood of success with interferon and ribavi-rin therapy is a race-blind 50 percent if in actuality it is only 20 percent?
*454 The majority opinion also creates uncertainty regarding the extent to which doctors may adhere to recommended medication dosages that vary based on race. For example, ethnic differences in cardiovascular drug response require physicians to base their dosage determinations on race to minimize dangerous side effects. See, e.g., Julie Johnson, Ethnic Differences in Cardiovascular Drug Response, 118 Circulation 1383 (2008). Are cardiologists supposed to prescribe dosages in a race-blind manner and at potential risk to their patients?
Doctors are put in an unenviable position if they must ignore critical “risk of harm” information when treating their patients. We should not require a physician “to perform a prefrontal lobotomy on himself.” Fleming Sales Co., Inc. v. Bailey, 611 F.Supp. 507, 514 (D.Ill.1985).
III. Conclusion
I concur in the judgment affirming the district court’s summary judgment in favor of Defendants. I agree with the specific conclusions of the majority opinion that the Eleventh Amendment does not bar Mitchell’s claim for damages against the Defendants in their individual capacities, that his claims for injunctive and declaratory relief are moot, that the summary judgment dismissing his claims for damages against Kelly Cunningham was appropriate, and that Dr. Bell is entitled to qualified immunity on the claim for damages against him. I would not take up the question of whether Mitchell’s constitutional rights were violated, but if required to do so, conclude that they were not. I thus concur in part with the majority opinion and concur in full with its judgment.

. http://who.int/mkliacentre/factsheets/fs 164/ en.