**Tina Brown KLEMKA, Plaintiff,**

v.

**Richard NICHOLS and City of Shamokin, Defendants.**

No. 4:CV–95–1565.

United States District Court,
M.D. Pennsylvania.

Oct. 16, 1996.

James J. Riley, Riley and Fanelli, Pottsville, PA, for plaintiff.

Frank J. Lavery, Lavery & Kain, Harrisburg, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

Plaintiff Tina Brown Klemka (plaintiff or Klemka) brings this section 1983 action[1] against Corporal Richard R. Nichols of the Shamokin Police Department and against the City of Shamokin (the City). Plaintiff alleges that she was arrested on September 15, 1993 by Corporal Nichols while attending a memorial service at the Mt. Zion Welsh United Church of Christ on Grant Street in Shamokin, Pennsylvania. The memorial service was being held for plaintiff's two children, Ashley Werkheiser and Donovan Klemka, who died days earlier as a result of injuries sustained in a fire.

In her complaint, plaintiff alleges that she was seated near the front of the church, engaged in prayer, when Corporal Nichols entered the church and attempted to arrest her on misdemeanor charges for endangering the welfare of children. 18 Pa.Cons.Stat. Ann. § 4304.[2] Overhearing a loud disturbance, the Reverend Carl J. Crawford, pastor of the church, allegedly confronted Corporal Nichols and asked the nature of his business at the church. Nichols allegedly stated that he was there to arrest the plaintiff. Reverend Crawford told him not to enter the church. Disregarding that request, Corporal Nichols allegedly pushed his way past the pastor, took plaintiff by the arm, arrested her, and took her to the Shamokin Police Department. She was later taken to the Northumberland County Prison where she was incarcerated until bail was posted.

Originally, plaintiff asserted: 1) a First Amendment claim against Corporal Nichols (Count I); 2) a First Amendment claim against the City (Count II); 3) a Fourth Amendment claim against Corporal Nichols (Count III); and 4) a Fourth Amendment claim against the City (Count IV). Plaintiff was granted leave to amend and filed an amended complaint adding a claim under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. §§ 2000bb.

Currently before the court is a motion for summary judgment filed by defendants (record document no. 17). For the reasons which follow, defendants' motion will be granted.

### DISCUSSION

#### Summary judgment standard

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)

... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

---

1. 42 U.S.C. § 1983.

2. Section 4304 provides that:

    A parent, guardian, or other person supervising the welfare of a child under 18 years of age commits a misdemeanor of the second degree if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

    18 Pa.Cons.Stat.Ann. § 4304.

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 323 and 325, 106 S.Ct. at 2552 and 2554.

Issues of fact are " 'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 693–94 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

**First amendment and RFRA claims**

Plaintiff asserts that by entering the church and arresting her while the memorial service for her children was in progress, Corporal Nichols violated her right of religious freedom guaranteed by the First Amendment. The First Amendment guarantees the right to worship without governmental interference absent some compelling substantial need for curtailing the same.

RFRA was Congress' response to the United States Supreme Court's apparent departure in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) from the long-standing "compelling state interest-least restrictive alternative" standard applied to Free Exercise claims. *Smith* has been widely interpreted as jettisoning this long-standing test in favor of a standard which required a lesser showing on the part of the government to justify alleged infringements on First Amendment rights. See: *Smith,* 494 U.S. at 891–907, 110 S.Ct. at 1606–15 (O'Connor, J., concurring) and (Blackmun, J., dissenting).[3] In *Smith,* the court upheld the application of an Oregon statute which barred plaintiffs from receiving unemployment compensation benefits from the state because they had violated state criminal statutes by using peyote for religious purposes. Compare: *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (In a post-RFRA analysis, the Court invalidated a city ordinance prohibiting the killing of animals in religious rituals, but permitting the killing of animals under nearly any other circumstance, applying a standard other than that applied in *Smith.)*[4]

RFRA represents Congress' attempt to reinstate the pre-*Smith* standard as developed and applied in such cases as *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). See: *United States v. Meyers,* 95

---

**3.** In rejecting the Court's analysis and its holding, Justice Blackmun wrote:

This Court over the years painstakingly has developed a consistent and exacting standard to test the constitutionality of a state statute that burdens the free exercise of religion. Such a statute may stand only if the law in general, and the State's refusal to allow a religious exemption in particular, are justified by a compelling interest that cannot be served by less restrictive means.

Until today, I thought this was a settled and inviolate principle of this Court's First Amendment jurisprudence. The majority, however, perfunctorily dismisses it as a "constitutional anomaly." ... As carefully detailed in Justice O'Connor's concurring opinion ... the majority is able to arrive at this view only by mischaracterizing this Court's precedents. The Court discards leading free exercise cases such as

*Cantwell v. Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213] ... (1940), and *Wisconsin v. Yoder,* 406 U.S. 205 [92 S.Ct. 1526, 32 L.Ed.2d 15] ... (1972), as "hybrid." ... The Court cites cases in which, due to various exceptional circumstances, we found strict scrutiny inapposite, to hint that the Court has repudiated that standard altogether.... In short, it effectuates a wholesale overturning of settled law concerning the Religion Clauses of our Constitution.... *Smith,* 494 U.S. at 907–08, 110 S.Ct. at 1615–16 (Blackmun, J., dissenting).

**4.** See Allison J. Cornwell, Note, *Constitutional Law—Free Exercise Clause—Sacrificial Rites Become Constitutional Rights on the Altar of Babalu Aye,* 16 U.Ark.Little Rock L.J. 623 (1994) for a discussion of this decision.

F.3d 1475, 1481–82 (10th Cir.1996). Congress enacted RFRA to guarantee the application of that standard "in all cases where free exercise of religion is substantially burdened" and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(1) and (2).

■ "RFRA does not merely specify the standard which should be applied in 42 U.S.C. § 1983 cases involving governmental actions and/or policies which burden the exercise of religious beliefs; rather, RFRA provides 'a statutory claim or defense to persons whose religious exercise is substantially burdened by the government.'" *Rodriguez v. City of Chicago,* 1996 WL 22964 at *4 (N.D.Ill. Jan. 12, 1996).

RFRA provides that:

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b). Consistent with this provision, the courts have held that to prevail under RFRA, a plaintiff must demonstrate

that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.

*Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir. 1995), quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom.*

*Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1988).

■ Government action substantially burdens religious practices only if it significantly inhibits or constrains "conduct or expression that manifests some central tenet" of an individual's beliefs or "meaningfully" curtails the individual's ability to express adherence to his or her faith; or denies an individual reasonable opportunities to engage in those activities that are fundamental to that individual's religion. *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir.1995).

■ To establish a *prima facie* case, the plaintiff must demonstrate the existence of these three elements by a preponderance of the evidence. *Thiry v. Carlson,* 78 F.3d 1491, 1494 (10th Cir.1996). If plaintiff satisfies this threshold requirement, the burden then shifts to the government to demonstrate that the challenged regulation or governmental action furthers a compelling state interest in the least restrictive manner feasible. *Werner,* 49 F.3d at 1476, 1480 n. 2 (citing 42 U.S.C. § 2000bb–1(b)).

Defendants challenge the constitutionality of RFRA. We need not and should not resolve that issue here, because it is not essential to our resolution of the pending motion. As a matter of general principle, courts are required to refrain from deciding constitutional issues not essential to the resolution of the case before them. We do note, however, that although commentators have expressed serious doubts about the constitutionality of RFRA,[5] the Fifth and Seventh Circuit Courts of Appeal have ruled the Act constitutional under Section 5 of the Fourteenth Amendment. *Sasnett v. Sullivan,* 91 F.3d 1018 (7th Cir.1996) and *Flores v. City of Boerne, Texas,* 73 F.3d 1352 (5th Cir.1996). Cf. *Goehring v. Brophy,* 94 F.3d 1294, 1306 (9th Cir. Sept. 3, 1996) (Fernandez, concurring) ("I have serious doubts about the con-

**5.** See, e.g., Marci A. Hamilton, *The Religious Freedom Restoration Act: Letting the Fox into the Henhouse under Cover of Section 5 of the Fourteenth Amendment,* 216 Cardozo L.Rev. 357 (1994); Christopher L. Eisgruber and Lawrence G. Sager, *Why the Religious Freedom Restoration Act Is Unconstitutional,* 69 N.Y.U.L.Rev. 437, 444–45, 452–60 (1994); Scott C. Idleman, *The Religious Freedom Restoration Act: Pushing the*

*Limits of Legislative Power,* 73 Tex.L.Rev. 247, 285–302 (1994); Jay S. Bybee, *Taking Liberties with the First Amendment: Congress, Section 5, and the Religious Freedom Restoration Act,* 48 Vand.L.Rev. 1539, 1624–33 (1995); and Daniel O. Conkle, *The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute,* 56 Mont.L.Rev. 39, 60–79 (1995).

stitutionality of Congress's attempt to overrule Smith and to reinstate (or instate) a flawed view of the scope and proper construction of the religion clauses. In this I am not alone.")

**Plaintiff's case**

Defendants do not dispute that the United Church of Christ is an established religion. Although they do dispute the sincerity of plaintiff's religious convictions, we will consider that issue resolved in plaintiff's favor for purposes of deciding the pending motion. This leaves before us only the question of whether plaintiff has established that Corporal Nichols' conduct substantially burdened the exercise of her religion.

■ Statements of fact not disputed by the plaintiff compel the conclusion that no action taken by Corporal Nichols substantially interfered with plaintiff's practice of her faith. The statements which follow are taken from defendants' statement of undisputed material facts filed pursuant to Local Rule 7.4 (with some non-substantive editing by the court.). Except where otherwise noted, the statements set forth below are not disputed by plaintiff. If a statement is disputed, plaintiff's version of the disputed fact is set forth and is accepted by the court for purposes of ruling on the current motion.

13.[6] Tina Brown Klemka was baptized as a Methodist, but none of her children has been baptized. Once she moved to Shamokin in 1991, Klemka did not join any local church, and as of September 15, 1993, she was not a member of any church in Shamokin.

14. Prior to September 14, 1993, Klemka had never applied for membership at the Welsh United Church of Christ, was never baptized or initiated in that church, and had never attended services there prior to September 15, 1993.

15. On September 7, 1993, Pam Bailey and Karen Treibly, who are case workers with the Northumberland County Children and Youth Services, stopped by the Shamokin police station to learn the circum-

stances surrounding the fire at 107 East Arch Street earlier that day. As a result of that fire, two of plaintiff's children, Ashley Werkheiser and Donovan Klemka, perished.

. . . .

20. Prior to September 15, 1993, Corporal Nichols returned to the neighborhood of the fire and conducted a re-interview of all of the original complainants. There were atrocious comments made by the neighbors that the children were better off dead.

. . . .

25. In response to the neighbors' allegations that the children were left unsupervised and neglected, Klemka also acknowledged that food may have been placed out on the back porch for the children while she was working. She cannot say whether Avis Bowers' statements about dogs eating the food on the porch that was intended for the children was true or not because she was not there.

26. On September 14, 1993, Corporal Nichols received another telephone call from Avis Bowers in which she indicated that she had "insider information" that Klemka, Greg and the children were going to leave Pennsylvania at the conclusion of the memorial service which was scheduled for September 15. Ms. Bowers also indicated that the memorial service was going to be held at the Mt. Zion Welsh United Church of Christ in Shamokin from 3:00 p.m. until 5:00 p.m. and that a family gathering would be held at a relative's residence located at 149 Grant Street following the service.

. . . .

31. . . . . On September 15, 1993, case workers from Children and Youth Services obtained a court order from the Court of Common Pleas, Northumberland County, Pennsylvania directing Children and Youth Services to seize plaintiff's two remaining children.

. . . .

---

**6.** For the sake of consistency and ease of reference, the court has retained the system of numbered paragraphs used by defendants in their statement (record document no. 19) and by plaintiff in her response (record document no. 24).

33. On the afternoon of September 14, 1993, Corporal Nichols reviewed the results of his investigation into the allegations of abuse and/or neglect against Klemka with Assistant District Attorney Anthony Rosini who, after consultation with the District Attorney, authorized the filing of reckless endangerment charges against the plaintiff. At that meeting, Corporal Nichols also discussed with Assistant District Attorney Rosini his intention to serve the court order and arrest warrant following the conclusion of the memorial service at 149 Grant Street where Nichols understood there was going to be a family gathering.

. . . .

38. ... Corporal Nichols arrived at 149 Grant Street ... [and] was advised by Officers Brown and Bendas that neither Klemka nor her children were at the Grant street address ... Mrs. Welliver, plaintiff's mother, indicated that she did not know where the children were, but that they were safe. . . .

39. Following his conversation with Mrs. Welliver, Corporal Nichols saw two women come down off the porch at 149 Grant Street, go across the street, and into the church. . . . [7]

. . . .

41. Reverend Crawford told Cpl. Nichols that a memorial service was on-going and Cpl. Nichols could not enter the Church.[8]

43. Corporal Nichols then took several steps towards the church and noticed Klemka sitting on a folding chair in the foyer or the cloak room where you go into the building proper and hang your coats before you enter the church itself. [Plaintiff disputes the remaining portions of paragraph 43.]

44. Reverend Crawford did not lie to Cpl. Nichols. The Reverend stood in the doorway and was physically pushed by Cpl. Nichols.[9]

45. When Corporal Nichols announced that he had an arrest warrant for Klemka, her sisters began to shout obscenities, but Tina offered no resistance and came outside willingly. Plaintiff was not handcuffed, and she was taken to the police station, accompanied by her Aunt Donna, where she was advised of her rights and signed a *Miranda* card at 5:45 p.m.

. . . .

47. Reverend Crawford informed Cpl. Nichols that the memorial service was in progress. . . . See No. 41 above. Plaintiff was in a Church at a time of day when Nichols had been told by Bowers that a memorial service was to take place.[10]

48. Klemka admitted during her deposition that the bench she was sitting on was less than five feet from the outside doors of the church and that she does not know what time she was arrested.

49. Plaintiff was not arrested for exercising any religious beliefs and at no time after Corporal Nichols announced that he had a valid and lawful arrest warrant did plaintiff indicate that she was engaged in any memorial service, nor did she request an opportunity to enter the church proper to mourn by the urn.

50. During her deposition, Klemka acknowledged that when Corporal Nichols said she was under arrest, she never said to him that she needed time to be up with the urn to mourn her children.

51. Officer Brown learned about the memorial service after this incident was over and no one at 149 Grant Street mentioned that there was a memorial service for the two deceased children taking place when the officers were present there.

52. Klemka did not know any Methodist church in Shamokin and when Rev. Crawford offered his services, she accepted them. The memorial service took an hour or so, and started at approximately 3:10 or 3:15 p.m. because Klemka was late.

---

7. Portions of paragraph 39 are controverted by the plaintiff. We have included here only those portions *not* controverted by the plaintiff.

8. This statement is taken from plaintiff's response.

9. This statement is taken from plaintiff's response.

10. This statement is taken from plaintiff's response.

53. Klemka's sister, Teresa, had run over to 149 Grant Street prior to the commotion outside in order to change her clothes.

54. At the time she heard the commotion outside, Klemka was not by the urn, rather, she was two to three pews from the back of the church. Klemka's sister Teresa ran into the church saying they were going to arrest Tina so Tina walked through the inside doorway and sat on a foot bench in the vestibule and one of the outside doors of the church was open.

56. During her deposition, Klemka admitted that Rev. Crawford had yelled at Corporal Nichols in a loud and hostile voice to get out of Crawford's church.

57. At the time of plaintiff's arrest, there were no indicia of any ongoing memorial service. Among the factors leading Corporal Nichols to this conclusion was the fact that: Avis Bowers had previously indicated that the memorial service would be held from 3:00 to 5:00 p.m.; Corporal Nichols saw plaintiff's mother and two sisters at 149 Grant Street after 5:00 p.m. and not at the church; there was no audible prayer, song or other service emanating from the church through the open front door; the preacher came outside to view the commotion at 149 Grant Street and denied that Tina was still inside the church;[11] the vestibule or foyer was lit, but the church itself was darkened; Klemka was seated in the foyer in the presence of several family members; and based upon Nichols' observations of the darkened church along with the preacher's actions, he believed that Klemka was either hiding out or being hidden in the church.

There can be no dispute about the following key facts and conclusions based on the record before us: 1) when Corporal Nichols arrived at the Church, the memorial service for the children was no longer in progress; 2) plaintiff's mother was in her home across the street from the Church when Corporal Nichols arrived and asked her about the whereabouts of plaintiff and her children; 3) Reverend Crawford met Corporal Nichols at the door to the church; 4) although Reverend Crawford told plaintiff that a memorial service was then in progress, his actions belie his words; 5) if the memorial service were still in progress, Reverend Crawford, the church pastor, would presumably have been otherwise occupied and would not have been available to bar Corporal Nichols' entrance into the church; 6) further, plaintiff's mother (the deceased children's grandmother) would presumably have been in attendance at any service still underway in their memory; 7) plaintiff herself was observed by Corporal Nichols seated not far from the door, in the church foyer; 8) plaintiff was in the presence of several family members; 9) Corporal Nichols saw no religious service or ceremony in progress; 10) no one whom Corporal Nichols spoke to at 149 Grant Street indicated that a memorial service for the two deceased children was still in progress; 11) the memorial service was scheduled to conclude at 5:00 p.m., with a family gathering at a relative's residence at 149 Grant Street to follow; 12) plaintiff signed the Miranda card at 5:45 p.m.; 13) Klemka voluntarily emerged from the church and did not state at that time that Corporal Nichols had interrupted her in prayer or in observance of any other religious tenet or belief nor did she request that he refrain from taking her into custody at that moment so that she could finishing worshiping.

Plaintiff cannot establish a prima facie case under either RFRA or the First Amendment. She offers no evidence that she was interrupted by Corporal Nichols while practicing her faith. All undisputed facts suggest otherwise. The religious service had plainly concluded by the time Corporal Nichols arrived on the scene and began making inquiries about plaintiff's whereabouts and the location of her two remaining children who were to be taken into custody by child welfare authorities who accompanied Corporal Nichols.

---

11. Although plaintiff did not deny or dispute paragraph 57 of defendants' statement of material facts, plaintiff does dispute elsewhere in her response defendants' statement that Reverend Crawford lied about plaintiff's whereabouts and denied she was in the church when questioned by Corporal Nichols.

By itself, plaintiff's presence inside a church when Corporal Nichols came to execute the arrest warrant is not sufficient to establish a prima facie case of religious interference. See, e.g., *Thiry,* 78 F.3d at 1495 (Although plaintiffs established that they would be both "distressed and inconvenienced over the relocation of their daughter's gravesite and loss of access to that particular site itself," their testimony that they would still continue their religious beliefs and practices even if government condemnation of the gravesite proceeded as proposed undercut their RFRA claim.); *Goehring v. Brophy,* 94 F.3d 1294 (9th Cir. 1996); and *Goodall v. Stafford County School Board,* 60 F.3d 168, 172 (4th Cir. 1995) (economic burden did not substantially burden plaintiffs' free exercise of their religion). Cf. *Tatum v. Morton,* 562 F.2d 1279 (D.C.1977) (arrest of attendants at peaceful Quaker prayer vigil outside White House violated the First Amendment). If religious activity or observances have not been substantially burdened, no violation of RFRA has occurred. *C.L.U.B. v. City of Chicago,* 1996 WL 89241 at *20 (N.D.Ill. Feb. 27, 1996).

The most that can reasonably be inferred from the undisputed facts before us is that plaintiff was interrupted in a private prayer vigil by Corporal Nichols' appearance at the church door. That is insufficient to demonstrate substantial interference with the observation of a central tenet of her religion.

In taking plaintiff into custody, Corporal Nichols in no way "significantly inhibited" or constrained plaintiff's conduct or expression manifesting some central tenet of her religious beliefs or denied her a reasonable opportunity to engage in activities fundamental to the practice of her religion. Adapted from *Werner,* 49 F.3d at 1480.

■ Even if there were evidence of record supporting the contention that plaintiff's religious rights were substantially burdened by Corporal Nichols, the undisputed facts would persuade us that the burden imposed on plaintiff's practice of her faith was justified by a compelling state interest in guaranteeing the safety of plaintiff's two remaining children. See generally: *Goehring,* 94 F.3d at 1300 ("Public health and well-being have been recognized as compelling governmental interests in a variety of contexts.") and *American Life League, Inc. v. Reno,* 47 F.3d 642, 656 (4th Cir.1995) ("[W]e do not think the Free Exercise Clause shields conduct violating a criminal law that protects people and property from physical harm.")

The facts known to the authorities at the time were these: Two of plaintiff's children died in a tragic house fire. Neighbors had given alarming reports about the care and treatment of plaintiff's children. They related incidents of the children being locked out of the house while plaintiff was at work and of food intended for the children being left outside on the porch and being eaten by dogs. One individual to whom the authorities spoke voiced the extreme view that the two deceased children "were better off." It was plaintiff's stated intention to leave for New Jersey immediately after the memorial service and, presumably, to take her two remaining children with her.

Acting on this information and following customary practice on such matters, Corporal Nichols accompanied the child welfare worker to ensure there was no disturbance when she took the children into custody and to execute the arrest warrant for plaintiff issued by the district justice.

Although plaintiff argues that the state was not motivated by any desire to ensure the welfare of the children because, among other reasons, they were not taken into custody until several hours later and officials could have pulled over plaintiff's vehicle to arrest her. A lapse of several hours in taking the children into custody does not prove that the state was unconcerned with their safety. Nor were officials obliged to wait until plaintiff had left the City enroute to New Jersey and then issue an all-points bulletin to have her vehicle stopped so that she could be arrested.

Under the circumstances, it would have been imprudent for the authorities not to have pursued the matter and to have allowed plaintiff to return to New Jersey with her two remaining children without investigating the complaints of mistreatment and neglect.

If officials had done nothing, weeks or months may have gone by after plaintiff's return to New Jersey with no investigation into the welfare of the two remaining children. Even if Pennsylvania officials relayed the information and reports of mistreatment to New Jersey officials, more time would have passed until the matter was pursued there and the safety of the children assured.

■ Protecting the welfare of minor children is unquestionably a compelling state interest. An "objectively reasonable basis for believing that a threat to the child's health or safety is imminent," justifies governmental removal of the child from parental custody. *Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir.1996). The state's interest unquestionably extends to include the right to pursue aggressively and promptly reports of parental neglect or abuse, investigate and bring charges against the parent if warranted—all in such a manner as is calculated to guarantee the safety of the child.

When balanced against the extremely minimal intrusion, if any, on plaintiff's religious practices, Corporal Nichols' action was plainly justified by the compelling state interest in protecting the children.

### Fourth Amendment

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." No Fourth Amendment rights were implicated by Corporal Nichols' seizure of the plaintiff. Plaintiff's asserted Fourth Amendment claim is inextricably tied to her First Amendment claim. Only the time, place or manner of plaintiff's arrest could render it unreasonable. No other aspects of the arrest are challenged. We have already concluded that, as a matter of law, Corporal Nichols did nothing improper in approaching the church, challenging the pastor and arresting the plaintiff when she emerged from the vestibule.

Judgment will, therefore, be entered in defendants' favor on plaintiff's Fourth Amendment claims.

### Qualified immunity

Even if we had resolved the foregoing issues in plaintiff's favor at this stage, we would, nevertheless, grant defendants' motion on grounds of qualified immunity. Under the doctrine of qualified immunity, state and local officials performing administrative and executive functions are shielded from suits for civil damages brought under section 1983 insofar as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Qualified immunity applies even in instances "where the rights were clearly established, if it was objectively reasonable for the official to believe that his acts did not violate those rights." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.), *cert. denied*, 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993).

■ A defendant may prevail on a defense of qualified immunity by demonstrating that: (1) "it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by a federal statute or the Constitution"; (2) "it was not clear at the time of the acts that an exemption did not permit those acts"; or (3) "it was objectively reasonable for ... [the defendant] to believe that his acts did not violate [the plaintiff's] rights." *Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987).

■ If there are no genuine issues as to any material fact, the application of qualified immunity is a question of law for the court to decide. *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995). It becomes the court's obligation to determine, as a matter of law: 1) the law defining the right alleged to be injured; 2) the clarity with which such law was established at the time of the alleged injury; and 3) the objective reasonableness of the defendant's conduct. *Id.*

■ Here, Corporal Nichols did not infringe on any clearly established right in executing the arrest warrant when he encountered plaintiff at the church. His conduct was certainly objectively reasonable. His information was that plaintiff intended to

leave immediately for New Jersey. Had she done so, he would have been unable to execute the warrant without instituting extradition proceedings. Not to have executed the warrant under the circumstances would have been objectively unreasonable.

### Monell claim

The basis for plaintiff's Monell claim is her assertion that the City failed to provide adequate training to Corporal Nichols on arrest procedures. *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Although we have found that Corporal Nichols committed no constitutional violation, that alone, does not mandate judgment in defendants' favor on the *Monell* claim. *Simmons v. City of Philadelphia,* 947 F.2d 1042, 1062 (3d Cir. 1991).

■■■ To recover under *Monell,* the plaintiff must: 1) identify the officials or governmental bodies with final policymaking authority; and 2) prove that those individuals "have, through their decisions, 'caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity.' " *Simmons,* 947 F.2d at 1062, quoting *Jett v. Dallas Independent School District,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). The plaintiff must establish that the policymakers acted with " 'deliberate indifference to the rights of persons with whom the police came into contact.' " *Simmons,* 947 F.2d at 1060–61 and 1064.

■■■ The issue before this court in ruling on the City's motion for summary judgment is whether "the record contains the minimum quantum of evidence from which the jury could conclude that City policymakers' deliberate or acquiescent election" not to adopt a policy barring arrest of a suspect during a religious service or barring the arrest of a suspect tracked to a place of worship was the " 'moving force' " behind a violation of plaintiff's constitutional rights. *Simmons,* 947 F.2d at 1069. "With respect to plaintiff's failure to train theory, the central inquiry, from the same evidentiary standpoint, is whether 'the failure to provide proper training ... actually" caused plaintiff to suffer a constitutional injury. *Id.*

■■■ That standard is not met here. Plaintiff pins her *Monell* claim on two assertions: 1) that the City had no policy dealing specifically with the arrest of persons in a church or engaged in a religious service or ritual; and 2) that the absence of such a policy mandates constitutional liability.

While the first assertion is certainly true, based upon the record before us, we disagree with the second. The City has no constitutional obligation to formulate a policy for, and train officers in, every situation which might conceivably arise in connection with an arrest. The fact that no policy existed certainly does not support the inference that by this omission the City condoned unconstitutional practices. Further, as we have already stated, the only reasonable inference which can be drawn from the record before us is that the religious service had concluded by the time Corporal Nichols arrived and there was nothing to suggest to him that plaintiff was interrupted in private prayer or religious contemplation.

For all of these reasons, judgment will be granted in favor of the City on plaintiff's *Monell* claim.